IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| DARREN J. PEPIN, | CV 14-211-M-DLC-JCL |
| Plaintiff, | |
| vs. | FINDINGS & RECOMMENDATION |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Darren Pepin brings this action under 42 U.S.C. § 405(g) seeking judicial review of the decision of the Commissioner of Social Security denying his application for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, §§ 1382-1385. Pepin alleges disability since June 29, 2010, due to right shoulder pain, anxiety, depression, chronic fatigue, and insomnia. (Tr. 236). Pepin's claim was denied initially and on reconsideration. Pepin appeared with counsel at an administrative hearing in front of an administrative law judge (ALJ) on February 10, 2014. (Tr. 56-84). On March 7, 2014, the ALJ issued a decision finding Pepin not disabled within the meaning of the Act. (Tr. 22-37). The Appeals Council

denied Pepin's request for review, making the ALJ's decision the agency's final decision for purposes of judicial review. (Tr. 1-6). Jurisdiction vests with this Court pursuant to 42 U.S.C. § 405(g).

Pepin was 44 years old at the time of his alleged onset date, and 48 years old at the time of the ALJ's decision.

## I.     Standard of Review

This Court's review is limited. The Court may set aside the Commissioner's decision only where the decision is not supported by substantial evidence or where the decision is based on legal error. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Widmark v. Barnhart,* 454 F.3d 1063, 1070 (9th Cir. 2006).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). This Court must uphold the Commissioner's findings "if supported by inferences reasonably drawn from the record." *Batson v. Commissioner of Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir. 2004). "[I]f evidence exists to support more than one rational interpretation," the

Court "must defer to the Commissioner's decision." *Batson*, 359 F.3d at 1193

(*citing Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999).  This Court

"may not substitute its judgment for that of the Commissioner."  *Widmark*, 454

F.3d at 1070 (*quoting Edlund*, 253 F.3d at 1156).

## II.    <u>Burden of Proof</u>

To establish disability, a claimant bears "the burden of proving an 'inability

to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which...has lasted or can be expected

to last for a continuous period of not less than 12 months.'" *Batson*, 359 F.3d at

1193-94 (*quoting* 42 U.S.C. § 423(d)(1)(A)).

In determining whether a claimant is disabled, the Commissioner follows a

five-step sequential evaluation process.  20 C.F.R. § 404.1520.  The claimant bears

the burden of establishing disability at steps one through four of this process.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  At the first step, the ALJ

will consider whether the claimant is engaged in "substantial gainful activity."  20

C.F.R. § 404.1520(a)(4)(I).  If not, the ALJ must determine at step two whether the

claimant has any impairments that qualify as "severe" under the regulations.  20

C.F.R. § 404.1520(a)(4)(ii).  If the ALJ finds that the claimant does have one or

more severe impairments, the ALJ will compare those impairments to the

impairments listed in the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the ALJ finds at step three that the claimant has an impairment that meets or equals a listed impairment, then the claimant is considered disabled.  20 C.F.R. § 404.1520(a)(iii).

If, however, the claimant's impairments do not meet or equal the severity of any impairment described in the Listing of Impairments, then the ALJ must proceed to step four and consider whether the claimant retains the residual functional capacity (RFC) to perform his or her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant establishes an inability to engage in past work, the burden shifts to the Commissioner at step five to establish that the claimant can perform other work in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).

## III.  <u>Discussion</u>

The ALJ found at step one that Pepin met the insured status requirements of the Act through March 14, 2014, and had not engaged in substantial gainful activity since his alleged onset date.  (Tr. 26).  At step two, the ALJ found that Pepin had no severe physical impairments, but had the following severe mental impairments: major depressive disorder, personality disorder.  (Tr. 26).  The ALJ concluded at step three that Pepin did not have an impairment or combination of impairments that met or medically equaled any impairment described in the

Listing of Impairments. (Tr. 27). The ALJ also found that Pepin's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but his "statements concerning the intensity, persistence, and limiting effects of th[o]se symptoms" were not entirely credible. (Tr. 31). The ALJ concluded that Pepin had the residual functional capacity to perform a full range of work at all exertional levels, but incorporated nonexertional limitations restricting Pepin to work involving simple, routine, repetitive tasks and no greater than occasional interaction with coworkers, supervisors, or members of the general public. (Tr. 30). Based on that residual functional capacity assessment, the ALJ found at step four that Pepin was capable of performing past relevant work as a dishwasher. (Tr. 35). The ALJ made alternative findings at step five, concluding that Pepin was also capable of performing unskilled work as a construction laborer, mixing blending machine tender, or industrial cleaner. (Tr. 36).

## A. Credibility

Pepin argues the ALJ did not provide sufficiently clear and convincing reasons for discrediting his testimony. If the ALJ finds "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged," and "there is no evidence of malingering, the ALJ can reject the claimant's testimony about

the severity of his symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citations omitted).

Pepin testified that he sleeps only one hour a night and cannot work due to fatigue and insomnia. (Tr. 66, 70). Pepin described spending his days doing chores, grocery shopping, visiting the library and using the computers there for internet access, and going for walks. (Tr. 65-66). Pepin explained that he quit his prior job as a dishwasher because he was not physically capable of continuing. (Tr. 73). He described having "weird symptoms," including chest pain, facial numbness, slurred speech, and said he "was basically just risking my life physically" by working. (Tr. 67, 73). Pepin said he had been hospitalized several times because he would just "collapse and pass out, blackout, just get so fatigued, my legs would feel heavy, I'd collapse, shortness of breath, my face would go numb, muscle spasms, just a whole array of symptoms." (Tr. 74).

The ALJ considered Pepin's testimony but found him only partially credible for several reasons. To begin with, the ALJ discussed the fact that Pepin's medical records contained considerable evidence of malingering behavior on his part. (Tr. 31-32). For example, the ALJ cited an emergency room treatment note from December 2011. (Tr. 32, 424-25). Pepin went to the emergency room

complaining of depression and threatening self-injury. (Tr. 424). The attending physician noted that Pepin had been to the emergency room twelve times in the prior two to three months with the same complaints, and thought Pepin did "not like his present living situation" and was "looking for a place to sleep and eat." (Tr. 425). He diagnosed Pepin with depression, personality disorder, and malingering. (Tr. 425).

There are many similar references in the emergency room medical records cited by the ALJ. In June 2011, for example, Pepin went to the emergency room complaining of suicidal ideation and said he had nowhere else to go. (Tr. 484). The consulting psychologist found that Pepin's statement appeared "to have manipulative intention" (Tr. 484). Pepin stated he wanted to be committed to Warm Springs, but the psychologist determined that he did not meet the criteria, did not believe Pepin posed a danger to himself or others, and found that his request was "much more of a socially driven attempt to find a place to stay." (Tr. 32, 485). When Pepin visited the emergency room in August 2011, he reported feeling depressed but the attending physician noted "his affect does not necessarily reflect that" and he did "not appear to be overly depressed." (Tr. 474). The physician also noted that while Pepin claimed to have chronic fatigue and said he could not do much of anything, he seemed to walk around the unit without any

difficulty and was fairly social. (Tr. 474). In November 2011, Pepin presented to the emergency room looking for a place to stay. (Tr. 427). The attending physician noted that Pepein had been "seen earlier for another reason he made up so he could be admitted" and discharged Pepin with instructions to go to the Great Falls Rescue Mission. (Tr. 427-28). Emergency room notes from July 3, 2012, reflect that when Pepin arrived he was "initially screaming loudly and crying" and acting "as if voices were telling him what to do," but shortly after the doctor left the room Pepin "got on the phone and was talking very calmly and normally, calling friends, trying to find a place to stay." (Tr. 561). The doctor said it "seemed more that [Pepin] was putting on a show" and so "decided he probably did not need any psychiatric evaluation." (Tr. 561).

The ALJ also cited records from nurse practitioner Suzanne Lockwood who examined Pepin in September 2012 to rule out malingering among other things. (Tr. 32). Pepin told Lockwood he was not interested in therapy or medication, and although he complained of horrible anxiety, Lockwood observed that he was very relaxed and calm with no symptoms of anxiety. (Tr. 32, 809). Although the ALJ did not formally find that Pepin was malingering, he was certainly entitled to rely on the evidence discussed above in finding Pepin's testimony as to the debilitating severity of his symptoms less than entirely credible.

It was also legitimate for the ALJ to question Pepin's credibility because he alleged physical symptoms that were not supported by any medical evidence or related to a medical diagnosis. (Tr. 31). While Pepin testified that he suffered from disabling chronic fatigue, for example, consultative examining psychologist Patricia Webber noted in her June 2013 report that the "[m]edical records indicate [Pepin's] chronic fatigue syndrome was self-diagnosed." (Tr. 27, 620, 438). And when Pepin was admitted to the Montana State Hospital in March 2011, he complained of being unable to care for himself due to chronic fatigue. (Tr. 403-04). As the Admission Psychiatric Evaluation reflects, however, there was no medical diagnosis to substantiate his claims (Tr. 403).

The ALJ next discredited Pepin's testimony as to the severity of his symptoms based on the fact that he was not compliant with mental health treatment recommendations, without good reason. (Tr. 32). The records cited by the ALJ show that Pepin consistently refused psychiatric therapy and medication management. (See e.g. Tr. 408, 433, 443, 448, 459, 797, 806, 809). And when Pepin was prescribed psychiatric medications, he refused to take them or did not fill prescriptions. (Tr. 437, 444, 447, 462). *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (the ALJ may consider unexplained or inadequately explained failure to follow a prescribed course of treatment).

Pepin maintains any failure on his part to follow the treatment recommendations of his mental health care providers was justified because he could not afford to do so. There is no question that Pepin, who has been homeless for a number of years and on food stamps, has few financial resources. But there is no indication that Pepin was ever denied treatment due to inability to pay. To the contrary, emergency room doctors who were well aware of his financial and situation repeatedly referred Pepin to locally available resources follow up care, including the Mental Health Center and Community Health Center. (See e.g. 444, 459-60). Although he did not follow up on those referrals, the record reflects that Pepin consistently sought and received treatment at the local emergency room and elsewhere as needed. The ALJ expressly considered Pepin's testimony that he did not follow through with treatment recommendation due to lack of money, but found with record support that Pepin was not denied mental health treatment because of his financial condition and did not appear to have any difficulty seeking community resources to meet his needs. (Tr. 32).

Pepin maintains that given the nature of his mental impairments, the ALJ improperly penalized him for failing to take his medications, participate in

therapy, or otherwise comply with treatment recommendations. In some cases, it may be "questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996). But there is no indication here that Pepin's health care providers thought him incapable of understanding the options available to him, and the importance of treating his mental impairments with therapy and medication. As discussed above, their notes instead reflect that he simply chose not to participate in psychiatric therapy or medication management.

Pepin contends he did not take medication because of side effects, but there is little in the record to back this up. While the record reflects that Pepin sometimes reported that medications caused nausea, faintness, and fatigue, he typically made those statements while describing his psychiatric history to his doctors and attempting to explain his lack of treatment. (Tr. 402, 404, 526). Pepin has not pointed to medical evidence showing that he was forced to discontinue a particular medication due to side effects. The ALJ permissibly the fact that Pepin was not compliant with mental health treatment recommendations undermined his credibility.

Finally, the ALJ found that Pepin's daily activities suggested he was

capable of doing more than he alleged. For example, while Pepin claimed on the one hand that he suffered from debilitating chronic fatigue, he reported spending his days riding public transportation, going for walks, going to the library, doing chores, and watching movies. The ALJ reasonably found evidence of Pepin's daily activities suggested he was capable of greater activity than he alleged and called his credibility into question.

The Court thus concludes the ALJ provided sufficiently clear and convincing reasons for finding Pepin's testimony only partially credible.

### B.    Medical Opinions

Pepin argues the ALJ disregarded treating physician Dr. Rome Walter's medical records (Tr. 572-74, 637-50), and did not give enough weight to psychologist Dr. Polly Peterson's opinion. (Tr. 651-797).

A treating physician's opinion is entitled to greater weight than that of an examining physician on the basis that he has a "greater opportunity to observe and know the patient." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). An examining physician's opinion in turn "carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). The weight given a treating or examining physician's opinion depends on whether it is

supported by sufficient medical data and is consistent with other evidence in the record.  20 C.F.R. § 404.1527(d)(2).

The Commissioner may disregard a treating physician's opinion whether or not that opinion is contradicted.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  To discount the controverted opinion of a treating physician, the ALJ must provide "'specific and legitimate reasons' supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).  The ALJ may accomplish this by setting forth "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751.  Similar standards apply to the ALJ's evaluation of an examining physician's opinion.  *Widmark v. Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006).

### 1.    Dr. Walter

Dr. Walter first saw Pepin on June 16, 2009 – one year before his alleged onset date – and diagnosed him with depression.  (Tr. 637).  Pepin returned approximately three weeks later, at which time Dr. Walter diagnosed him with transient insomnia and wrote that he might have "some kind of atypical

personality disorder." (Tr. 639). Dr. Walter saw Pepin eight more times between July 2009 and January 2010. (Tr. 640-50, 572-74). Dr. Walter prescribed several medications and made a variety of diagnoses during that period, including anxiety, unspecified bipolar disorder, psychosexual disorder, unspecified episodic mood disorder, and a skin disorder. In December 2009, Dr. Walter thought that inpatient therapy "would be appropriate" but noted there were no good resources for someone like Pepin who was not suicidal (Tr. 645). Dr. Walter saw Pepin for the last time in January 2010 – six months before Pepin's alleged onset date. By that time, Pepin was doing much better, had better energy, improved mood, had been more active, was sleeping, and had no significant physical complaints. (Tr. 572).

Pepin maintains the ALJ erred by not specifically discussing Dr. Walter's records, which he claims show his insomnia was a severe impairment. The ALJ is not required to discuss every piece of evidence in his written decision. *Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003). Although the ALJ did not discuss Dr. Walter's records, it is nonetheless clear that he considered them because he cited to Dr. Walter's notes from June 16, 2009, in support of his statement that "examinations of [Pepin] during the longitudinal period show he was alert, oriented, and not in acute distress." (Tr. 34).

The ALJ addressed the fact that Pepin had often presented to the emergency room with complaints of fatigue and trouble sleeping, and had been diagnosed at various times with a variety of disorders. (Tr. 26). The ALJ ultimately found, with record support, that Pepin's severe impairments included a major depressive disorder and personality disorder. By the time Dr. Walter saw Pepin for the last time in January 2010 - six months before Pepin's alleged onset date – he wrote that Pepin was doing much better, had better energy, improved mood, had been more active, was sleeping, and had no significant physical complaints. (Tr. 572). Thus, it is not even clear that the ALJ rejected Dr. Walter's records such that any explanation was necessary.

Even assuming the ALJ erred in not addressing Dr. Walter's treatment notes, any error was harmless because it was "inconsequential to the ultimate nondisability determination in the context of the record as a whole." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). *See, e.g., Clark v. Colvin*, 2014 WL 639418 *8 (D. Mont. 2014); *Morales v. Colvin*, 534 Fed. Appx. 589, 591 (9th Cir. 2013) (unpublished) (finding ALJ's failure to address letters co-written by treating physician was harmless error where there were other reasons to reject them); *Hamilton v. Commissioner Social Sec.* Admin., 368 Fed. Appx. 724, 726 (9th Cir.

2010) (unpublished) (finding ALJ's failure to specifically discuss treating doctor's opinion was harmless error where the ALJ's decision otherwise contained "numerous specific and legitimate reasons for rejecting a conclusion that [the claimant] was disabled and so could not work); *Zettelmeier v. Astrue*, 387 Fed. Appx. 729, 731-32 (9th Cir. 2010) (unpublished).

      *2.*    Dr. Peterson

Pepin maintains the ALJ disregarded the recommendations of Dr. Polly Peterson upon his discharge from the Montana State Mental Hospital in March 2011. (Tr. 413).

The ALJ acknowledged that Pepin had spent nearly three weeks stay at the Montana State Mental Hospital in March 2011, and specifically cited Dr. Peterson's report several times. (Tr. 26, 27, 31, 32). At the time of Pepin's discharge, Dr. Peterson emphasized the importance of proper medication management and recommended that Pepin participate in individual psychotherapy. (Tr. 413). She wrote that given Pepin's "mental illness, cognitive difficulties, and character pathology, prognosis for treatment is poor." (Tr. 413).

As discussed above, however, there is ample evidence in the record showing that Pepin consistently disregarded his health care providers' recommendations

and chose not to participate in therapy or take prescription medications. Thus, any error on the ALJ's part in not specifically acknowledging that Dr. Peterson was among those to recommend medication management and therapy was harmless.

### C. Other Source Evidence

Pepin argues the ALJ erred by not giving more weight to records from licensed clinical social worker Joe Uhl (Tr. 799-804) and Advanced Practice Registered Nurse Suzanne Lockwood (Tr. 805-810).

Social workers and nurse practitioners do not qualify as acceptable medical sources. 20 C.F.R. §§ 404.1513(a),(d), 416.913(a),(d); SSR 06-3p. Only acceptable medical sources can render medical opinions. SSR 06-3p; 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Information from "other sources" may nevertheless "provide insight into the severity of the impairment and how it affects the individual's ability to function." SSR 06-3p. The ALJ may reject other source opinions by providing germane reasons. *Valentine v Commissioner SSA*, 574 F.3d 685, 694 (9th Cir. 2009); *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993); *Jamerson v. Chater*, 112 F.3d 1064, 1067 (9th Cir. 1997).

Uhl met with Pepin five times between July 2009 and December 2009. (Tr. 799-804). Pepin does not point to anything specific in Uhl's notes that he believes

the ALJ should have discussed or credited. If anything, Uhl's notes provide further evidence that Pepin simply refused much of the treatment offered him. At their first visit, for example, Pepin reported difficulty sleeping but said he refused to take the medicine prescribed him by Dr. Walter because "[h]e thinks he must do this naturally." (Tr. 799). The ALJ is not required to discuss every piece of evidence, and the Court fails to see how omitting mention of Uhl's notes was in any way consequential to the outcome here.

Lockwood met with Pepin a few times in August and September 2012, and completed a psychiatric assessment. (Tr. 805-809). Although the ALJ did not mention Lockwood by name, he addressed her records directly. He noticed, for example, that while Pepin complained of "horrible anxiety," Lockwood observed he "was very relaxed and calm, with no symptoms of anxiety." (Tr. 32, 809). The ALJ also noted that while Lockwood found Pepin's short term memory was severely impaired, psychological consultative examiner Dr. Patricia Webber was uncertain about Pepin's cognitive functioning because Pepin's effort on the formal assessments was questionable. (Tr. 31, 619-26). The ALJ reasonably credited Dr. Webber's opinion over that of Lockwood. In any event, the ALJ accommodated for Pepin's mental impairments by limiting him to work involving simple, routine, repetitive work tasks with only occasional social interaction.(Tr. 30).

The ALJ also addressed Pepin's GAF scores, including the fact that Lockwood assigned him a GAF score of 35. (Tr. 34). The ALJ gave little weight to the various GAF scores of record, including Lockwood's, "because of notes from treating sources documenting chronic noncompliance with mental health treatment recommendations." (Tr. 34). As discussed above, this finding is well supported by the record. The ALJ also found that Pepin's GAF scores were not consistent with the level of his "daily activities and ability to live independently, do self-care, and utilize public transportation to move around in his community." (Tr. 34). This too was a permissible basis for discounting the GAF scores, including the score assigned by Lockwood.

## D.     Duty to Develop the Record

Pepin maintains the ALJ failed to fully develop the record as to his alleged chronic fatigue syndrome.

The "ALJ in a social security case has an independent "'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (*quoting Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)). But this duty is triggered only when "there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v Massanari*, 276 F.3d 453, 459-60

(9th Cir. 2001).

Social Security Ruling 14-1p addresses claims involving chronic fatigue syndrome. SSR 14-1p, 2014 WL 1371245. The ruling states that if there is insufficient evidence to determine whether a person has chronic fatigue syndrome, the agency may contact the claimant's treating sources for additional information, request additional existing records, ask the claimant for more information, or arrange for a consultative examination. SRR 14-1p *7.

Pepin argues for the first time in his reply brief that the ALJ should have arranged for a consultative medical examination to address his alleged chronic fatigue syndrome. Because Pepin raises this argument for the first time in his reply brief, the Court need not address it. *See e.g.,Confederate Tribes of the Umatilla Indian Reservation v. Bonneville Power Admin.*, 342 F.3d 924, 933 (9th Cir. 2003). Regardless, Pepin's argument fails on the merits.

Pepin has often complained of fatigue to his various health care providers, but has never been diagnosed with chronic fatigue syndrome. Pepin's health care providers have consistently referred to Pepin's reported chronic fatigue syndrome as "self-diagnosed." (Tr. 437, 438, 453, 459, 460). As contemplated by SSR 14-1p, the agency arranged for a consultative psychological examination in June 2013. (Tr. 619-626). Dr. Patricia Webber performed the examination, noting at

the outset that Pepin's allegations included chronic fatigue. (Tr. 619). Dr. Webber commented that Pepin's medical records indicated his "chronic fatigue syndrome was self-diagnosed." (Tr. 620). She diagnosed Pepin with depressive disorder and personality disorder – both of which the ALJ agreed were severe impairments. (Tr. 625). The record was sufficiently unambiguous and adequate to allow the ALJ to properly evaluate the evidence as to Pepin's alleged chronic fatigue syndrome.

Pepin also argues the ALJ failed to fully develop the record by refusing to admit his high school records. (Doc. 13, at 22). Pepin maintains those records would support his claim that he is unable to work due to his mental impairments. Pepin graduated from high school in 1987 (Tr. 384), approximately 26 years before his alleged disability onset date. Pepin has not shown how his high school records are relevant to his disability claim. The ALJ had adequate and unambiguous evidence upon which to base his decision, and was not required to develop the record by securing Pepin's high school records.

### E. Bias

Pepin suggests the ALJ was impermissibly "biased" against him. (Doc. 13, at 21, 23). But to prevail on a claim "that the ALJ did not impartially assess the evidence...[a claimant] must show that the ALJ's behavior, in the context of the

whole case, was so extreme as to display clear inability to render fair judgment."
*Bayliss v. Barnhart*, 427 F.3d 1211, 1214-15 (9th Cir. 2005). "[E]xpressions of
impatience, dissatisfaction, annoyance, and even anger, that are within the bounds
of what imperfect men and women sometimes display, do not establish bias."
*Valentine v. Comm's of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). The
Court "must begin with a presumption that the ALJ was unbiased" which can be
rebutted "by showing a conflict of interest or some other specific reason for
disqualification." *Bayliess*, 427 F.3d at 1214-15. Pepin has not presented any
such evidence here and has not shown that the ALJ's ability to render fair
judgment was impaired.

### F.    Prior Application

Pepin filed a prior application for benefits under Titles II and XVI on July
31, 2009, which was denied initially on January 29, 2010. At the administrative
hearing on his current application, Pepin argued there was good cause to reopen
his prior application based on new medical evidence that related to the period
before 2009.

The Social Security regulations also allow the Commissioner to reopen a
decision for good cause within two years of the initial determination on an SSI
application and within four years of the initial determination on a DIB application.

20 C.F.R. § 404.988(b); 416.1488(b).  The ALJ permissibly denied Pepin's request to reopen his prior SSI application because his current application was filed more than two years after the prior claim was initially denied on January 29, 2010.  (Tr. 22).

There is good cause for reopening a prior application if (1) new and material evidence is furnished; (2) a clerical error in the computation or recomputation of benefits was made; or (3) the evidence that was considered in making the determination or decision clearly shows on its face that an error was made.  20 C.F.R. § 404.898.  The ALJ did not find good cause to reopen Pepin's prior DIB application because the "new evidence does not result in a finding of disability and a favorable decision."  (Tr. 22).

The district court does not have jurisdiction to review an ALJ's decision not to reopen a prior determination unless the claimant raises a colorable constitutional claim.  *See e.g. Udd v.* Massanari, 245 F.3d 1096, 1098-99 (9th Cir. 2001); *Panages v. Bowen*, 871 F.2d 91, 93 (9th Cir. 1989).   Pepin argues the ALJ's decision not to reopen his prior application violated his due process rights because he suffered from a mental impairment and was not represented by counsel at the time of the prior unfavorable decision.  *Evans v. Chater*, 110 F.3d 1480, 1483 (9th Cir. 1997) (holding claimant's mental impairments combined with lack of legal

representation was sufficient to assert a colorable constitutional claim).

"An allegation of mental impairment can form the basis of a colorable constitutional claim if the mental impairment prevented the claimant from understanding how to contest the denial of benefits. " *Udd*, 245 F.3d at 1099. Factors affecting a claimant's capacity to understand the procedures include: (1) "inability to read or write," (2) "lack of facility with the English language," (3) "limited education." and (4) "any mental or physical condition which limits the claimant's ability to do things for him/herself." SSR 91-5p, 1991 WL 208067 *2.

Here, Pepin has not presented evidence that he lacked the mental capacity to contest the decision denying his prior application for benefits. Pepin maintains that Dr. Walter's records show he was unable to understand the administrative process. As discussed above, however, Dr. Walter indicated that Pepin was "doing much better" by the time his prior claim was denied in January 2010. (Tr. 572). And in Dr. Webber's opinion, Pepin did not appear to have a clear cognitive deficit that would predict inability to care for himself. (Tr. 624). The record also reflects that Pepin was able to understand conversations about accessing community resources, engaged in a range of daily activities, and completed high school. (Tr. 460). Because Pepin has not presented a colorable constitutional claim, this Court lacks jurisdiction to review the ALJ's decision not

to reopen Pepin's prior claim for disability benefits.

**IV.**   **Conclusion**

For all of the above reasons, the Court concludes that the ALJ's decision is based on substantial evidence and free of legal error.  Accordingly,

IT IS RECOMMENDED that Pepin's motion for summary judgment be DENIED, and the Commissioner's decision be affirmed.

DATED this 10th day of April, 2015

Jeremiah C. Lynch
United States Magistrate Judge